**UNITED STATES of America, Plaintiff,**

**v.**

**Kelvin Alonzo LANDRY, Defendant.**

**CR. No. 3–88–090(02).**

United States District Court,
D. Minnesota,
Third Division.

March 31, 1989.

Paul Murphy, Asst. U.S. Atty., Minneapolis, Minn., for plaintiff.

Scott Tilsen, U.S. Public Defender, Minneapolis, Minn., for defendant.

## STATEMENT OF REASONS FOR IMPOSING SENTENCE

MAGNUSON, District Judge.

### I. Findings of Fact

Neither the government nor the defendant, Kelvin Alonzo Landry, has objected to the factual statements contained in the presentence investigation report (PSI).

The court therefore adopts those statements as its findings of fact. For purposes of this opinion the court will provide a synopsis of those findings and will highlight the facts that are pertinent to sentencing.

On September 28, 1988, a federal grand jury returned a five count indictment against Landry and three other defendants. Count I of the indictment charged Landry and the other three defendants with conspiracy to distribute cocaine, and count V charged Landry and Otis Tyrone Barrow with distribution of two ounces of cocaine on September 23, 1988. The other counts of the indictment did not name Landry. Count II charged Otis Barrow and Theresa Dunbar, Barrow's girlfriend, with distribution of two ounces of cocaine on August 5, 1988. Count III charged Theresa Dunbar and Louise Barrow, Otis Barrow's mother, with distribution of two ounces of cocaine on August 17, 1988. Count IV charged Otis Barrow alone with distribution of two ounces of cocaine on September 13, 1988. None of the defendants went to trial on these charges. Landry and Otis Barrow pleaded guilty to count V, and Dunbar and Louise Barrow pleaded guilty to count III.

Paragraphs 14–16 of the PSI describe Landry's involvement in the offenses charged in the indictment. On September 12, 1988, a confidential informant spoke to Otis Barrow in a recorded conversation in order to arrange for the purchase of two ounces of cocaine. The informant set up a meeting with a government agent, Barrow and himself at a bar and restaurant in Burnsville, Minnesota, on the following day. Barrow and Landry arrived at the location in a van driven by Landry. Barrow entered the agent's car alone and produced three plastic bundles, each containing approximately one ounce of cocaine. Barrow stated that the agent could choose two of the three ounces for a total purchase price of $2600. The agent produced $1500 and the informant contributed $1100 in confidential funds, which were given to Barrow. The acts involved in this transaction formed the basis for count IV of the indictment.

The agent then told Barrow that he had approximately $11,500 for purchasing additional cocaine. Barrow stated that he could reduce the price per ounce for a larger quantity. Barrow indicated that he would call the informant at a later time to set up the transaction. Otis Barrow, Dunbar, Landry and the informant conversed by phone several times between September 13 and September 23, 1988. During these conversations the informant made arrangements for the purchase of cocaine from Landry and Otis Barrow at the same bar and restaurant where the September 13 transaction took place.

Upon arrival at the appointed location, the agent observed Otis Barrow and Landry in a green Plymouth Horizon. Landry and Barrow entered the agent's vehicle and stated that ten ounces of cocaine would be available for purchase at $1150 per ounce. They asked for the money prior to delivery of the cocaine, but the agent refused to provide that much money up front. Instead the parties negotiated a plan in which the cocaine would be purchased in two-ounce increments. The agent then told Barrow that he needed to make a phone call. Barrow and Landry departed and promised to return in a few minutes, after the agent completed the phone call. The agent called additional agents and notified them of the transaction, and the agents planned to arrest Barrow and Landry when they returned. Barrow and Landry arrived shortly, and Barrow produced a bag containing a two-ounce chunk of cocaine. Other agents appeared on the scene and arrested Barrow and Landry. A search of Landry's person yielded $2000 cash, and a search of the Horizon's trunk revealed a bag containing an O'Haus Gram Scale. Count V of the indictment is based on these activities.

The PSI account of the criminal conduct alleged in the indictment does not contain any other references to defendant Landry. Similarly, the government failed to provide any additional evidence at sentencing. Otis Barrow was clearly the principal actor in this series of drug transactions, while Dunbar and Louise Barrow played a minimal role.

Landry's culpability falls somewhere in the middle. As the PSI reveals, Landry is no stranger to the drug world and to cocaine in particular. He admits involvement with drugs for the last ten years and heavy use of cocaine for at least the last five years. Landry admits selling drugs in order to buy more drugs, and he exhibits all of the classic symptoms of drug dependency. On the other hand, Landry's participation in the series of drug transactions was limited. No evidence has been presented which links Landry to counts II and III. With respect to count IV, Landry was not named in the indictment, and the evidence presented to the court at most establishes Landry's presence at the scene. It does not show that Landry was even aware that a drug deal was taking place. In contrast, Landry actively planned and participated in the September 23 transaction charged in count V.

## II. Application of the Guidelines

Because the offense to which Landry pleaded guilty occurred after November 1, 1987, the Sentencing Reform Act and the Sentencing Guidelines promulgated thereunder apply. In this case the court must address three issues that affect Landry's guidelines calculations. First, the court disagrees with the drug quantity used by the probation office for calculating Landry's base offense level. Second, Landry objects to the probation office's refusal to grant him a two-point reduction for acceptance of responsibility. Third, Landry objects to the criminal history score reflected in the PSI.

In the Sentencing Reform Act of 1984 [1] Congress described a number of factors to be considered by the court in imposing sentence. One of the most important factors is "the need to avoid unwanted sentencing disparities among defendants

---

1. The Sentencing Reform Act of 1984 was enacted as Chapter II of the Comprehensive Crime Control Act of 1984, Public Law 98–473, October 12, 1984, and is codified in 18 U.S.C. sections 3551–3586, 3621–3625, 3742 and 28 U.S.C. sections 991–998.

with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Congress also created the United States Sentencing Commission and authorized it to promulgate sentencing guidelines. One of the primary purposes of the Sentencing Commission is to

> establish sentencing policies and practices for the Federal criminal justice system that—
>
> (B) provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants ... while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices.

28 U.S.C. § 991(b)(1).

With these purposes in mind the Sentencing Commission drafted guidelines. The guidelines regime focuses on two sets of factors—offense characteristics and offender characteristics. The guidelines designate a base offense level ranging from one to forty-three for each statutorily defined crime. *See* United States Sentencing Commission, *Federal Sentencing Guidelines Manual,* Ch. 2 (1988). Specific offense guidelines include adjustments based on the amount of property involved, whether firearms were used, the degree of personal injury sustained by the victim, and so on. In addition, the guidelines set forth general adjustment provisions applicable to all offenses. These relate to the status of the victim, the offender's specific role in the offense, obstruction of justice, and acceptance of responsibility. *See id.* at ch. 3.

The only offender characteristics deemed relevant by the Commission relate to prior criminal history. *See id.* at ch. 4. From the offender's prior record the court must calculate a criminal history score. Specifically excluded from the calculus are the offender's age, education, vocational skills, mental condition, emotional condition, physical condition, previous employment record, family ties and responsibilities, and community ties. *See id.* at ch. 5 pt. H.

To choose the appropriate guideline sentence the court consults a two-dimensional matrix with offense level and criminal history category as its two axes. Each combination of offense level and criminal history score yields a specific range of months of imprisonment.

As an initial matter the United States Probation Office calculates a defendant's offense level, criminal history score, and imprisonment range. It then provides them to the court in the PSI. If the goals of certainty, fairness and avoidance of unwarranted disparity in sentencing are to be achieved, these calculations must be accurate and must respect a defendant's constitutional due process rights.

In the instant case neither the government nor the defendant objected to the base offense level of 20 calculated by the probation office. However, this offense level is inaccurate because it is derived from alleged criminal conduct for which there is no evidence against Landry.

Landry pleaded guilty to one count of distribution of cocaine. Guideline § 2D1.1(a)(3) specifies that the base offense level for such an offense is to be determined by reference to the Drug Quantity Table. The one count to which Landry pleaded guilty involved 55.5 grams of cocaine, which corresponds to a base offense level of 16 on the Drug Quantity Table. This contrasts with the base offense level of 20 arrived at by the probation office in paragraph 27 of the PSI. The probation office aggregated all of the cocaine charged in counts II, III, IV and V and 28.3 grams not charged against any of the defendants. The resulting 251.1 grams yields a level 20 on the Drug Quantity Table.

Application Note 6 to Guideline § 2D1.1 explains that "[t]ypes and quantities of drugs not specified in the count of conviction may be considered in determining the offense level." However, the court's discretion in this area is limited by Guideline § 1B1.3. In a drug trafficking case involving multiple transactions, the court may consider "all such acts and omissions that were part of the same course of conduct or

common scheme or plan as the offense of conviction." Guideline § 1B1.3(a)(2).

To date, few courts have interpreted § 1B1.3. Those courts which have addressed the issue have varied widely in their results. For example, in *United States v. Smith*, 1 Fed.Sent.R. 191, 1988 WL 142130 (W.D.Tenn.1988), the defendant was charged with one count of distribution of cocaine and a second count of distribution of cocaine base. He pleaded guilty to count one, and the court dismissed count two at sentencing. The court refused to use the drugs charged in count two in calculating the base offense level. The court stated that "[t]o include in that level crimes or conduct which have not been proven to be convictions, is not providing certainty and *fairness* in meeting the purposes of sentencing...." *Id.* at 192 (emphasis in original). As a result, the court determined that "the conduct necessary to support inclusion in the Base Offense Level must be established by a finding of the jury, a plea of guilty confirmed by a finding of guilty in open court, or a stipulated offense other than the offense of conviction...." *Id.* at 193.

The Court of Appeals for the Fifth Circuit has taken a different view. In *United States v. Juarez–Ortega*, 866 F.2d 747 (5th Cir.1989), the jury had convicted the defendant of two counts of distribution of cocaine but had acquitted him of a third count of carrying a firearm during a drug trafficking offense. Despite this verdict the district court enhanced the defendant's sentence on the grounds that the defendant carried a gun during the drug offense. The court of appeals affirmed, holding that the jury's determination "does not necessarily preclude consideration of the underlying facts of the offense at sentencing so long as those facts meet the reliability standard." *Id.* at 749. The court did not elaborate on the requirements of this "reliability standard."

Similarly, in *United States v. Guerrero*, 863 F.2d 245 (2d Cir.1988), the Court of Appeals for the Second Circuit did not define a standard of reliability for determining whether nonadjudicated conduct is relevant to sentencing. The court merely found that since the prosecutor and the defendant had entered into a sentencing stipulation in which the defendant admitted involvement in a dismissed drug count, the conduct underlying the dismissed count was relevant to sentencing. Landry did not stipulate to any of the conduct underlying counts II, III and IV, however, so *Guerrero* is not helpful.

The Court of Appeals for the Eighth Circuit has not addressed this issue yet, but an analysis of pre-guidelines procedures sheds light on the proper interpretation of § 1B1.3. Before the guidelines went into effect the district court enjoyed broad discretion at sentencing. The court could consider uncorroborated hearsay evidence and unprosecuted criminal activity, provided that the court allowed the defendant to explain or rebut the evidence. *United States v. York*, 830 F.2d 885, 893 (8th Cir.1987), *cert. denied*, ___ U.S. ___, 108 S.Ct. 1047, 98 L.Ed.2d 1010 (1988). Sentencing hearings were rare, and the standards of proof at such proceedings were not well-defined. In *United States v. Fatico*, 603 F.2d 1053 (2d Cir.1979), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980), the district court had applied a "clear, unequivocal and convincing evidence" standard at the sentencing hearing. The second circuit affirmed but declined to adopt any standard of proof. However, the court rejected the defendant's contention that the government's burden of proof at sentencing is "beyond a reasonable doubt." *Id.* at 1057 n. 9.

The Constitution sets the parameters for determining the extent to which nonadjudicated conduct is relevant to sentencing. A defendant has a constitutional due process right not to be sentenced on the basis of either invalid information or groundless inferences drawn from otherwise valid information. *United States v. Fogel*, 829 F.2d 77, 90 (D.C.Cir.1987); *United States v. Safirstein*, 827 F.2d 1380, 1385 (9th Cir.1987). This would be true even in the absence of sentencing guidelines, but the structure of the guidelines heightens this concern. For a defendant in Landry's

position, accepting or rejecting the use of additional drug quantities in calculating the guideline range could mean a difference of up to 22 months in prison.

Guideline § 6A1.3(a) states that "[i]n resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." Certainly the government may bring disputed information to the court's attention; indeed it has a duty to do so. However, the court will not use the information as a basis for calculating the guideline offense level or ciminal history score unless the government can establish the reliability of the information by a preponderance of the evidence. In Landry's case the government has provided no evidence to tie the defendant to counts II and III of the indictment, and insufficient evidence to warrant consideration of the drugs in count IV in calculating Landry's base offense level. Therefore, the quantity of cocaine relevant to Landry's offense is 55.5 grams, and his base offense level is 16.

Landry contends that he also is entitled to a two-point offense level reduction for acceptance of responsibility. Paragraph 24 of the PSI recommends that Landry not receive credit for acceptance of responsibility because he neither demonstrated sincere contrition nor indicated any plans to withdraw from his criminal conduct or associations. The court agrees with this assessment and therefore will not award Landry a two-point reduction.

The final area of inquiry is Landry's criminal history score. Paragraph 37 of the PSI counts one point against Landry for a bad check charge to which he pleaded guilty on September 16, 1986. The court had sentenced Landry to make $140 restitution, but upon Landry's failure to make payment the court issued a bench warrant for his arrest and ordered him to serve eight days in jail. If Landry had paid the $140 he would have avoided incarceration,

and the bad check offense would not have been counted as one point in Landry's criminal history score.

Landry contends that the eight-day incarceration sentence was constitutionally invalid and that it should not be used to enhance his sentence in the instant offense. The court agrees. The Supreme Court has condemned the practice of "imprisoning a person solely because he lacks funds to pay the fine." *Bearden v. Georgia*, 461 U.S. 660, 674, 103 S.Ct. 2064, 2074, 76 L.Ed.2d 221 (1983). In *Bearden* the Court ruled that probation may not be automatically revoked for failure to pay a fine or make restitution. A court may not order the offender incarcerated unless it makes a finding that the offender willfully refused to pay or failed to make sufficient bona fide efforts to acquire the resources to pay. *Id.* at 672–73, 103 S.Ct. at 2072–73.

In Landry's case it is unclear whether Landry made a bona fide effort to pay. The government does not address this issue. Instead, the government argues that Landry may not collaterally attack the validity of his conviction. The government's position is that a defendant must appeal the conviction directly or exhaust other state remedies before complaining of an invalid conviction to this court.

The government is incorrect. The guidelines specifically provide for this type of challenge at sentencing. "When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor." Guideline § 6A1.3(a). The validity of a prior conviction or sentence easily qualifies as a factor important to sentencing. The Sentencing Commission recognized this in the commentary to Guideline § 4A1.2. "Convictions which the defendant shows to have been constitutionally invalid may not be counted in the criminal history score." Guideline § 4A1.2 Application Note 6.

The government emphasizes the delay and complication that will result in many cases due to the difficulty of recon-

structing the facts of a previous case. This may be true for a few cases, but a defendant cannot be required to surrender his due process rights in order to preserve administrative efficiency. Moreover, similar procedures were required under the now repealed Special Offenders Statute, 18 U.S.C. §§ 3575, 3576, and their practicability has been demonstrated. *See United States v. Burt,* 802 F.2d 330, 332–33 (9th Cir.1986); *United States v. Scarborough,* 777 F.2d 175, 181 (4th Cir.1985).

■ In conclusion, the court finds that Landry has properly challenged the validity of his prior bad check charge and has made a prima facie case for its constitutional infirmity. The government has not provided sufficient evidence in rebuttal. Thus Landry's criminal history score is nine, not ten, and his criminal history category is IV instead of V.

Having made these findings, the court determines that the applicable guidelines are:

| | |
|---|---|
| Total Offense Level: | 16 |
| Criminal History Score: | 9—Category IV |
| Applicable Guideline Range: | 33—41 months |

III. Sentence

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the court that the defendant shall be committed to the custody of the Bureau of Prisons to be imprisoned for a term of 33 months. Upon release from imprisonment, the defendant shall be placed on supervised release for a period of three years. In addition, the defendant shall pay a special assessment in the amount of $50 pursuant to 18 U.S.C. § 3013.

The court imposes sentence within the range applicable to this defendant and for this offense because the facts found are of the kind contemplated by the guidelines. No aggravating or mitigating circumstances exist that were not adequately considered by the Sentencing Commission.

The court recognizes that the defendant is indigent. Therefore, because of the defendant's inability to pay, the court does not order the defendant to pay a fine, costs of imprisonment or costs of supervision.