UNITED STATES of America, Appellee,

v.

Randolph JAKOBETZ, Defendant–Appellant.

No. 52, Docket 91–1125.

United States Court of Appeals, Second Circuit.

Argued Sept. 11, 1991.

Decided Jan. 9, 1992.

---

William K. Sessions, III, Middlebury, Vt. (Sessions, Keiner, Dumont, Barnes & Everitt, Bonnie Barnes, of counsel), for defendant-appellant.

Charles A. Caruso, Burlington, Vt., Acting U.S. Atty., D. Vt. (George J. Terwilliger, III, U.S. Atty., D. Vt., David V. Kirby, Chief, Criminal Div., John P. Tavana, Asst. U.S. Atty., of counsel), for appellee.

Before NEWMAN, and PRATT, Circuit Judges, and MILTON POLLACK, District Judge for the Southern District of New York, sitting by designation.

GEORGE C. PRATT, Circuit Judge:

Defendant Randolph B. Jakobetz appeals from his conviction for kidnapping, 18 U.S.C. § 1201(a)(1), based on a jury verdict in the United States District Court for the District of Vermont, Franklin S. Billings, Jr., *Chief Judge.* He was sentenced to 350 months incarceration followed by five years of supervised release, and restitution of $2,102. Jakobetz complains of several evidentiary rulings, the most important of which is the court's permitting DNA profiling evidence. He also challenges several aspects of his sentence.

Although it arises from relatively simple facts, the primary issue on this appeal raises a complicated question regarding the admissibility of complex "novel" scientific evidence—the results of DNA profiling analysis, an issue which, on a pretrial motion *in limine*, occupied eight full days of hearings before the district court. The court heard testimony from nine experts, five for the government and four for the defense. After these lengthy hearings, Judge Billings credited the testimony of the government's experts and held that the DNA evidence was sufficiently reliable to be presented to the jury.

To resolve this primary issue, one of first impression in this circuit, we consider whether and under what circumstances, the results of DNA profiling evidence should be admissible in a criminal trial. The DNA analysis in this case was performed by the Federal Bureau of Investigation ("FBI") in its forensic laboratory to compare a blood sample taken from defendant Jakobetz with a semen sample obtained from a vaginal swab of a female victim allegedly kidnapped and raped by Jakobetz. The FBI concluded that the DNA profiles from the two samples constituted a "match" and calculated that there was one chance in 300 million that the DNA from the semen sample could have come from someone in the Caucasian population other than Jakobetz.

The probability numbers in this case illustrate how devastating such evidence can be against a criminal defendant. Realistically, the results of such testing can be so dramatic as to become virtually dispositive on the question of identity, which often determines a defendant's guilt or innocence. Jakobetz asks us to hold that the DNA evidence should never have been submitted to a jury. After careful consideration, however, we decline to so hold.

To place this question in context, we will first describe the facts surrounding this crime. We will then discuss, albeit in greatly simplified terms, the scientific background of DNA profiling, as well as the techniques used to develop the relevant evidence. Next, we will look to the legal standards of admissibility and determine which standard applies to these circumstances. Ultimately, we will determine that the district court did not err by allowing the FBI's DNA results into evidence. Finally, we will briefly address the other, lesser issues raised by Jakobetz.

## I. FACTS

The underlying facts in this case are straightforward. A young woman from Burlington, Vermont, travelling south on vacation, stopped at a rest area along Interstate 91 in Westminster, Vermont, to make a telephone call and to use the rest room. On her way out of the rest room, she was grabbed from behind, thrown to the floor, handcuffed, her mouth stuffed with paper towels, and her head covered with a pillowcase. She was then forced into the back of a tractor-trailer, which began to move almost immediately.

Approximately half an hour later, the tractor-trailer stopped. Jakobetz entered the back of the trailer and proceeded to brutally and repeatedly rape and sexually assault his victim. Before leaving, he removed the handcuffs from the woman's

hands and tied them with a length of rope. Jakobetz then drove for approximately two hours before he stopped to check on his victim. Because he stopped in a well-lit area, the victim was able to see Jakobetz through the pillowcase when he opened the back of the trailer. Jakobetz continued to drive for another two hours before stopping again—this time to release the victim. He left her on the roadside in the Bronx, New York.

After looking for help for approximately half an hour, the woman was finally able to get assistance from a passing motorist who called the police. The New York Police Department transported her to a hospital where she received treatment. A semen sample, taken from a swab of the woman's vagina, was sent to the FBI laboratory for DNA analysis.

When the woman returned to Vermont, she examined her vehicle and noticed that her purse was missing, as was a travel bag containing cosmetics, cassette tapes, some bathing suits, and a 35mm camera borrowed from her father. The camera contained a roll of partially exposed film.

An investigation ensued immediately. Telephone records for the pay phones located at the Westminster rest area indicated that immediately prior to the telephone call made by the victim, someone had made a 46-minute, collect call to a number in Schuyler Falls, New York, listed under the name of P. Zanon. Further investigation revealed that P. Zanon was married to Jakobetz.

Jakobetz drove a truck for Wildcat Construction Company in St. Albans Bay, Vermont. That company's records revealed that Jakobetz had departed St. Albans Bay en route to Westbury, Long Island, New York, on June 13, 1989, the day of the kidnapping. His route included Interstate 95 through Westminster, Vermont. Expense reports submitted by Jakobetz included a New York Transit Authority toll receipt for travel across the Throgs Neck Bridge, which connects the Bronx, New York, with Queens, Long Island, and lies along Jakobetz's most direct route to Westbury, Long Island, Jakobetz's destination.

The receipt was time-stamped at 3:28 a.m. on June 14, 1989; the woman had been released at approximately 3:00 a.m. on June 14, 1989, and the travel time from where she was released to the Throgs Neck Bridge was approximately thirty minutes.

Wildcat Construction Company allowed law enforcement officials to search the trailer hauled by Jakobetz on June 13, 1989. The search revealed samples of head hair and pubic hair which matched those of the young woman. Armed with warrants, officers searched Jakobetz's home, his personal vehicle, and his tractor-trailer cab. In the cab, they found handcuff keys, two knives, and two green pillow cases similar to those described by the victim. In Jakobetz's home, they found a set of handcuffs. In a shed behind his residence, they found nine rolls of undeveloped 35mm film. The film had not been specified in the search warrants, and the government did not develop the film until after November 29, 1989, when authorization was obtained by court order. One of the rolls of film contained pictures taken during a fishing trip by the victim's father and his friends. The camera that disappeared from the victim's car had been lent to her by her father and it had contained partially exposed film.

From a photographic lineup containing a picture of Jakobetz that had been obtained from New York State authorities, who had used the picture in a separate criminal proceeding, the victim positively identified Jakobetz as the man who had abducted and raped her.

Before the case went to trial, Jakobetz moved to suppress the photo display as well as all the evidence obtained in the searches of his residence, his car, and his cab. The district court denied the motion with respect to the photo display and any evidence that was seized pursuant to the search warrants, but it did suppress all seized evidence that was not particularized in the warrants. Jakobetz also moved *in limine* to prohibit introduction of the government's DNA profile evidence. After an extensive hearing, discussed in detail below, this motion was also denied.

During the trial, various government witnesses, including the victim, testified about the offense and the ensuing investigation. The woman identified Jakobetz in the courtroom as the man who had kidnapped and raped her. The government also presented the testimony of a special agent of the FBI, one of the four experts it had used during the admissibility hearings. The agent testified regarding the DNA test results as well as the methods and procedures used to obtain the results. In addition to other defense testimony, Jakobetz used the testimony of two of its five experts to try to discredit the DNA evidence during trial.

On October 1, 1990, the jury found Jakobetz guilty.

## II.  SCIENTIFIC BACKGROUND OF DNA PROFILING

Before we analyze the general problems surrounding the admissibility of novel scientific evidence, we shall consider the nature of the particular scientific evidence at issue in this case. A general understanding of the scientific theories and procedures involved here is necessary to understand the legal and practical impact of such evidence. If a more comprehensive description of DNA and its analysis is desired, the district court's opinion on this issue is instructive. *See United States v. Jakobetz*, 747 F.Supp. 250 (D.Vt.1990). *See also* Edward J. Imwinkelried, *The Debate in the DNA Cases over the Foundation for the Admission of Scientific Evidence: The Importance of Human Error as a Cause of Forensic Misanalysis*, 69 Wash. U.L.Q. 19 (1991); William C. Thompson & Simon Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Va.L.Rev. 45 (1989); Paul C. Giannelli & Edward J. Imwinkelried, Scientific Evidence (1986 & 1990 Supp.).

Deoxyribonucleic acid ("DNA") is found in the chromosomes of every cell and contains the coded information that provides the genetic blueprint for all living things. Every cell of a particular individual contains the same configuration of DNA. The important feature of DNA for forensic purposes is that, with the exception of identical twins, no two individuals have the same DNA configuration.

A molecule of DNA is shaped like a double helix and resembles a twisted ladder. The sides of the ladder, which are composed of phosphate and sugar molecules, are connected by "rungs" made up of pairs of molecules called "bases". For the purposes of DNA profiling, the critical components of the ladder are these rungs. Each rung is composed of one pair of the following four organic bases: adenine, guanine, cytosine, and thymine. Because of their chemical compositions, adenine will attach only to thymine and cytosine will attach only to guanine. This strict "complementary" pairing means that the order of the bases on one side of a DNA ladder will determine the order on the other side.

Each rung is called a "base pair" or "base sequence", and the order in which these base pairs appear on the DNA ladder constitutes the genetic code for the cell. This code carries the necessary information to produce the many proteins which comprise the human body. Because human beings share more biological similarities than differences, approximately 99 percent of the DNA molecules in each of us are the same. Certain sections of the DNA ladder, however, take different forms in different individuals. It is these areas where the base pairs differ between individuals, areas called "polymorphisms", which provide the basis for DNA identification and produce great significance for forensic testing.

A sequence of base pairs responsible for producing a particular protein is called a "gene". Some genes are polymorphic and may have two or more different versions called "alleles". The total fragment length of a polymorphism is called a Restriction Fragment Length Polymorphism (RFLP) and its length is determined by the number of repeat core sequences of base pairs, which are called Variable Number Tandem Repeats (VNTRs). A particular region on the DNA molecule where a specific VNTR occurs is called a "locus". A locus is considered polymorphic when the number of VNTRs varies from individual to individual.

Some RFLPs exhibit only two forms or sequences of base pairs, but others are hypervariable and have many forms. Because it is impractical to examine all the polymorphic regions of the DNA molecule, DNA profiling focuses on several highly polymorphic or hypervariable segments of DNA. Different people will have the same VNTRs in a particular hypervariable locus, but the loci will differ in length because varying numbers of the VNTRs are linked together. Although a person may not have a unique polymorphic area at any one locus, the frequency with which two people will exhibit eight or ten of these alleles at four or five different loci is extremely low.

DNA analysis is generally performed by disassembling the ladder in one of several ways. The FBI uses a method called "RFLP analysis", where the long chain of DNA molecules is broken into shorter fragments, and the two sides of the DNA ladder are chemically "unzipped" into two single strands of DNA. A single, unzipped strand of DNA is attracted to other "complementary strands", which then gravitate toward each other and "zip" together to create a double-stranded molecule in a process called "hybridization". Genetic engineers construct special kinds of DNA molecules called "genetic probes", which, during the hybridization process, seek out and lock onto complementary strands. These genetic probes are used to locate those regions of DNA that are polymorphic. The specific steps of RFLP analysis are described below:

1. *Extraction of DNA.* The DNA is first extracted from the evidentiary sample by using chemical enzymes and then purified.

2. *Restriction or digestion.* The DNA is then "cut" with chemical scissors called "restriction endonucleases". These endonucleases recognize certain base pairs and sever the DNA molecule at specifically targeted base pair sites to produce RFLPs.

3. *Gel electrophesis.* The cut fragments of DNA molecules are next placed in an agarose gel which is later electrically polarized to sort the fragments by length. Because DNA is negatively charged, the RFLPs will migrate toward the positive end of the gel. The distance travelled will depend upon the length of the fragment, with the shorter fragments, which are lighter, travelling further in the gel. Fragments of known base-pair lengths, called molecular weight markers, are placed in separate lanes to allow the measurement of RFLPs in units of base pairs. Several different samples are run on the same gel, but in different tracks or lanes.

4. *Southern transfer.* Because the agarose gel is cumbersome to work with, the RFLPs are transferred to a more functional surface by a method called southern transfer. A sheet of nylon membranes, called a nitrocellulose sheet, is placed in contact with the gel, and through capillary action, the RFLPs move onto the membranes. The RFLPs then become permanently fixed in their respective positions on the sheet, commonly referred to as a "blot". Also during this step, the RFLPs are unzipped into two strands by a process called denaturization.

5. *Hybridization.* Next, a genetic probe, which is a single-stranded segment of DNA designed to complement a single-stranded base sequence of RFLP on the blot, is used to locate a specific locus of a polymorphic region of the DNA. The probe will bond with RFLPs of all sizes containing that particular core sequence or VNTR. The genetic probe is tagged with a radioactive marker, which attaches to the probe and emits radiation without altering the function of the probe. The marker is used to determine the probe's position on the blot after it hybridizes with a polymorphic segment.

6. *Autoradiography.* Autoradiography is the photographic process that allows us to see the position of the polymorphic DNA segments. The nylon membrane, with hybridized polymorphic segments, is placed against a piece of x-ray film where the radioactive probes expose the film at their respective locations. After the film is processed, black bands appear where the radioactive probes have bonded to the RFLPs, producing the "DNA print". The position of each band indicates the location

of a polymorphic segment on the blot, and location, in turn, indicates the length of the DNA fragment that contains the segment. Because individuals vary in the length of the DNA fragments that contain the polymorphic DNA segments, individuals tend to differ in the position of their bands on a DNA print.

The hybridization process is then repeated using different probes to locate different VNTRs, which are put on separate autoradiographs. The FBI usually uses four or five different probes on a single sample. Several probes are necessary because although the degree of individualization for the two alleles (one from each parent) that occur at one locus is not high, it is extremely rare for two people to have eight or ten matching alleles across four or five different loci.

7. *Interpretation of autoradiographs.* The final step is to determine if a match exists in the two lanes of the autoradiograph between a known sample of a suspect and the unknown sample taken from the crime scene or victim. The FBI uses a two-stage procedure for deciding whether a match exists. First, the FBI looks for a visual match. If no visual match exists, the FBI decides whether the non-match should be interpreted as inconclusive or as excluding the suspect. If a visual match is declared, however, the FBI takes a mechanical measurement to verify that a match does, indeed, exist. A computer imaging process is used to reference the bands to the molecular weight markers on the autoradiograph. Because these reference points have a known value in base pair units, the number of base pairs in the polymorphic sequence represented by the band on the autoradiograph can be measured. If the two bands differ in the number of base pairs they have by less than 2.5 percent, the FBI will proclaim a match for that particular RFLP. If the difference between the two exceeds 2.5 percent, the autoradiograph is considered either inconclusive or as an exclusion of the suspect.

Once matches are declared for the respective RFLPs, the FBI calculates the statistical significance of a match between two DNA profiles using tools from the field of human population genetics. The statistical significance is measured by the frequency with which a pattern of alleles occurs in a specific population.

The FBI first determines the frequency with which each *individual* allele occurs in a particular population by using an approach called "fixed bin analysis". A bin is an arbitrarily defined range of base pairs. Any allele with a base-pair length within that range is classified as belonging to that bin.

The FBI then samples a targeted population to establish a data base of allele frequencies. The FBI has compiled, or is in the process of compiling, data bases for Caucasians, Blacks, Asians, and Hispanics. The FBI's Caucasian data base at issue here was derived from blood samples of approximately 225 FBI agents from throughout the United States. The FBI produced autoradiographs for each blood sample, measured the alleles, categorized them within the appropriate bin, and calculated the frequency of occurrence for alleles falling within their respective bins. The FBI uses these frequencies to predict the frequency with which the entire pattern of alleles produced from the forensic sample would occur in the target population. For this final calculation, the FBI applies the "product rule" and multiplies the frequencies.

In this particular case, the FBI calculated that the frequency with which the defendant's genotype occurs in the Caucasian population is one in 300 million.

## III. LEGAL STANDARD OF ADMISSIBILITY FOR NOVEL SCIENTIFIC EVIDENCE

### A. Background

■ The question of when novel scientific evidence should be admitted as evidence at trial was first addressed in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). Under this standard, admissibility is governed by whether the novel scientific technique has been "sufficiently established to have gained general acceptance in the par-

ticular field in which it belongs." *Id.* at 1014. The *Frye* court assumed that general acceptance indicated reliability and that only reliable evidence should be admissible.

The majority of jurisdictions that have faced similar issues have adopted the *Frye* test, and to this day, it remains the majority rule. However, the rule has not escaped significant criticism or downright rejection. It has been attacked for its overly conservative approach to admissibility and its susceptibility to manipulation in order to exclude novel scientific evidence. *See* McCormick on Evidence § 203 (3d ed. 1984). In recent years, especially after the enactment of the Federal Rules of Evidence and its Article VII rules on the use of expert testimony, a number of jurisdictions have abandoned the *Frye* rule.

In fact, the second circuit was one of the first jurisdictions to abandon the *Frye* methodology in favor of a more liberal approach. In *United States v. Williams*, 583 F.2d 1194, 1198 (2d Cir.1978), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979), we held that the *Frye* standard had been superseded by the Federal Rules of Evidence, which stressed a more permissive method for determining admissibility. We likened the standard for admissibility of scientific evidence to that for other evidence, and we stated that evidence is admissible if the probativeness, materiality, and reliability of the evidence outweighs its tendency to mislead, prejudice, and confuse the jury. *Id.*

Because the probativeness and materiality of most scientific evidence proffered to the jury are not usually in dispute, the *Williams* test boils down to a balancing of the reliability of the evidence against its potential negative impact on the jury. The *Williams* court suggested some specific factors that could affect a court's determination of reliability: (1) the potential rate of error; (2) the existence and maintenance of standards; (3) the care and concern with which a scientific technique has been employed, and whether it appears to lend itself to abuse; (4) the existence of an analogous relationship with other types of scientific techniques and results that are routinely admitted into evidence; and (5) the presence of " 'fail-safe' " characteristics or the likelihood that potential inaccuracies will redound to the defendant's benefit rather than his detriment. *Id.* at 1198–99. After considering these reliability factors, we stated that a court should engage in a balancing, similar to that provided by Fed. R.Evid. 403, to determine whether the probative value of the proffered evidence substantially outweighs its danger of unfair prejudice. *Id.*

Despite the liberal approach taken in *Williams*, other jurisdictions that have recently considered the specific question of the admissibility of DNA evidence seem to be reverting to a more cautious approach, one even more stringent than that in *Frye*. In a highly publicized case, a New York state trial court stated a new rule with respect to the admissibility of DNA profiling evidence. *People v. Castro*, 144 Misc.2d 956, 545 N.Y.S.2d 985 (N.Y.Sup.Ct. 1989). The *Castro* court acknowledged that New York generally follows the *Frye* rule in determining the admissibility of novel scientific evidence, but because the court deemed that DNA evidence presented special problems of reliability, it added another layer to make that already conservative test even more stringent. *Id.* 545 N.Y.S.2d at 986.

The court in *Castro* decided the question of admissibility by dividing the inquiry into three prongs: (1) whether a theory exists that is generally accepted in the scientific community and that supports the conclusion that DNA forensic testing can produce reliable results; (2) whether techniques or experiments currently exist that are capable of producing reliable results in DNA identification and that are generally accepted in the scientific community; and (3) whether the testing laboratory in the particular case performed the accepted scientific techniques in analyzing the forensic samples. *Id.* at 987.

The first two prongs are standards already embedded in the *Frye* test; the first focuses on the theory and the second focuses on the technique. The third prong, however, goes beyond the requirements tradi-

tionally demanded by *Frye*. The court itself acknowledged that some other courts, "in guarding the province of the trier of facts, have indicated that the third question goes to the weight of the evidence not the admissibility under *Frye*." *Id*. The *Castro* court, however, believed that "given the complexity of the DNA multi-system identification tests and the powerful impact that they may have on a jury, passing muster under *Frye* alone is insufficient to place this type of evidence before a jury without a preliminary, critical examination of the actual testing procedures performed in a particular case." *Id*.

A similar, elevated standard had also been adopted by the only other federal circuit court to face this issue. Although the panel's decision was vacated when the defendant was granted a rehearing *en banc*, and the appeal was ultimately dismissed with an order to dismiss the indictment when the defendant died, *see United States v. Two Bulls*, 925 F.2d 1127 (8th Cir.1991), we consider the decision for its legal analysis. In *United States v. Two Bulls*, 918 F.2d 56 (8th Cir.1990), the defendant, who had entered a conditional guilty plea, challenged the district court's pretrial determination that DNA profiling evidence obtained from a semen stain in the victim's underwear would be admissible in a sexual abuse trial. The district court had applied Fed.R.Evid. 702 in making its ruling, and the defendant claimed that this was error. He insisted that the more stringent *Frye* test was the appropriate standard. *Id*. at 58. The government countered by arguing that a more stringent standard would require long, drawn-out testimony before trial, and urging that rule 702 creates a liberal rule of admissibility which now supersedes *Frye*. *Id*. at 59. The eighth circuit, however, rejected the government's argument, vacated the defendant's conviction, and remanded to the district court for a more extensive hearing on the question of admissibility.

In reaching its decision, the *Two Bulls* court ultimately adopted the three-prong test laid out by the *Castro* court. It distinguished scientific evidence that was in an experimental or developmental stage from evidence that had been generally accepted. The court held that both the *Frye* test and rule 702 required a proper foundation before admitting DNA evidence to the jury, stating that "[n]either rule should permit speculative and conjectural testing which fails normal foundational requirements necessary for the admissibility of scientific testimony or opinion." *Id*. at 60. The court further stated:

> Because DNA evidence is so new and the resulting prejudice to the defendant is sufficiently great, it is imperative that the court satisfy itself that there exists a sufficient foundational basis as to the overall admissibility of the evidence. This must be done before the government exposes the jury to the lab results. If the court has explored only scientific acceptability and the reliability of acceptable testing procedures in camera, and then, at trial the government fails to show that the lab tests did conform to reliable procedures, the court would have to exclude the evidence for lack of foundation. In doing so, the resulting prejudice to the defendant would be obvious. Notwithstanding the fact that an objection is sustained and the evidence excluded, aside from valuable trial time wasted, the jury would be exposed to prejudicial proofs and left to speculate as to why the defendant opposed the ultimate result.

*Id*. at 60. Thus, the *Two Bulls* court concluded that the defendant's conviction should be vacated because the district court had not considered whether the testing procedures used by the FBI lab in the case had been properly conducted. *Id*. at 61. It remanded the case for a hearing as to the reliability of the evidence under its new standard.

Professor Imwinkelried has endorsed the type of test adopted by the *Castro* and *Two Bulls* courts. *See generally*, Imwinkelried, *supra*, at 24–33. He emphasizes the potential for errors in executing a particular protocol, arguing that although the protocol itself may be generally accepted, the court must focus on the particular circumstances under which that protocol was performed. *Id*. Similarly, Professors Thomp-

son and Ford also point out that DNA evidence presents courts with special challenges due to the complexity of the evidence and the public misconceptions held by most people. *See* Thompson & Ford, *supra,* at 52–53. They also advocate a determination of proper implementation in the particular case as a threshold issue before admitting DNA evidence. *Id.* at 58.

### B. Analysis

On this appeal, Jakobetz claims that the district court erred in ruling that the FBI's DNA profiling evidence was admissible against him. Applying the *Williams* test, the district court found that the factors weighed in favor of admission, and after a Fed.R.Evid. 403 balancing, it concluded that the probative weight of the evidence was not substantially outweighed by any danger of unfair prejudice to the defendant.

Jakobetz acknowledges that *Williams* governs the admissibility of novel scientific evidence in the second circuit, but he contends that the question as to the standard of proof required to show reliability is still an open one. He argues that, in order to fully protect the defendant from unreliable evidence that might significantly influence a jury, the government should have to prove the reliability of the evidence beyond a reasonable doubt. Without such a standard, Jakobetz claims, the *Williams* relevancy standard of admissibility would place on the defendant a burden of establishing unreliability. In effect, Jakobetz would have us engraft a high burden of proof on the reliability prong of the *Williams* test, and thereby convert it into a far more formidable barrier. Ultimately, Jakobetz asks us to follow the eighth circuit's approach in *Two Bulls,* where the court incorporated the *Castro* three-pronged test for admissibility.

Jakobetz supports his position by asserting that there is a very real danger that the critical faculties of the lay jurors were overwhelmed by the highly technical features of forensic DNA testing and the immense statistical probabilities of a match, not to mention the complex statistical evidence itself. He insists that the jury was unable to independently and critically scrutinize the technical DNA evidence when confronted by the testimony of experts. He urges that an "aura of mystic infallibility" of this evidence caused the jury to abdicate its independent fact-finding function, thereby prejudicing his defense.

We disagree. Although we realize that DNA evidence does present special challenges, we do not think that they are so special as to require a new standard of admissibility. Despite the difficulties involved in cases with novel, complex, and confusing evidence, the jury must retain its fact-finding function.

We think the approach for admitting novel scientific evidence we adopted in *Williams* applies even to something as complicated as DNA profiling. *Williams* embodies the standards implicit in the Federal Rules of Evidence, especially rule 702, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The test thus boils down to whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *See* McCormick § 203 at 607. This "helpfulness test subsumes a relevancy analysis", 3 Weinstein & Berger, Weinstein's Evidence § 702[02] at 18, which in turn assumes a threshold level of reliability. The *Williams* factors serve as general guidelines to assist a court in fulfilling its fundamental screening function. Within these guidelines, general acceptability may be indicative of the "reliability and consequent probative value of the evidence." Weinstein § 702[03] at 702–41.

The general acceptability principle from *Frye* should not, however, convert the *Williams* test into a difficult hurdle that excludes highly relevant evidence simply because it is complicated. The focus of the court must be on "the admissibility or non-

admissibility of a particular type of scientific evidence", not "the truth or falsity of an alleged scientific 'fact' or 'truth'". *Williams*, 583 F.2d at 1198. In other words, the court need not make the initial determination that the expert testimony or the evidence proffered is true before submitting the information to the jury. The court must allow the jury to discharge its duties of weighing the evidence, making credibility determinations, and ultimately deciding the facts.

This approach is supported by Professor McCormick, who has been one of the most outspoken critics of the *Frye* test. He would have any relevant conclusions supported by a qualified expert witness admitted into evidence unless there are distinct reasons for exclusion. McCormick § 203 at 608. He states:

> It [McCormick's approach] permits general scientific opinion of both underlying principles and particular applications to be considered in evaluating the worth of the testimony. In so treating the yeas and nays of the members of a scientific discipline as but one indication of the validity, accuracy, and reliability of the technique, the traditional balancing method focuses the court's attention where it belongs—on the *actual usefulness* of the evidence in light of the full record developed on the power of the scientific test.

*Id.* at 609 (emphasis added).

In addition, Judge Weinstein has stated that the "[e]limination of the *Frye* test is consistent with the underlying policies of Article VII." 3 Weinstein & Berger, Weinstein's Evidence § 702[03] at 702–36 (1989). He states that because the federal rules emphasize "liberalizing expert testimony, doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions." *Id.* at 30. Furthermore, "*[t]he jury is intelligent enough, aided by counsel, to ignore what is unhelpful in its deliberations.*" *Id.* (emphasis added).

We agree with both Professor McCormick and Judge Weinstein. Although scientific and statistical evidence may seem complicated, we do not think that a jury will be so dazzled or swayed as to ignore evidence suggesting that an experiment was improperly conducted or that testing procedures have not been established.

As a final matter, we note that the district court seemed concerned about some perceived ambiguities in second circuit case law regarding the admissibility of expert testimony. The two cases cited in his footnote on the point, *see United States v. Jakobetz*, 747 F.Supp. 250, 255 n. 7 (D.Vt. 1990), are not departures from the *Williams* methodology. In *United States v. Torniero*, 735 F.2d 725, 731 (2d Cir.1984), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 788, 83 L.Ed.2d 782 (1985), psychiatric testimony was found to be irrelevant by the district court. In *United States v. McBride*, 786 F.2d 45, 51 (2d Cir.1986), we held that the trial court erred by excluding relevant psychiatric testimony on state of mind, stating that psychiatry did have general acceptance in the field of medicine. Neither of these cases dealt with the type of novel scientific theory and technique involved in this case.

C. Application of *Williams* to This Case

■ We now turn to the specifics of this case. In denying Jakobetz's motion to suppress the DNA profiling evidence, the district court looked first to the *Williams* test, noting that "[t]he essential question is not whether the technique is infallible, but rather whether the scientific technique exhibits 'a level of reliability sufficient to warrant its use in the courtroom.'" *Jakobetz*, 747 F.Supp. at 255 (quoting *Williams*, 583 F.2d at 1198). Judge Billings looked beyond the five *Williams* factors, however, and considered several additional factors before finding the evidence admissible: (1) the experts' qualifications and stature; (2) the existence of specialized literature; (3) the novelty of the technique and its relationship to more established areas of scientific analysis; (4) whether the technique has been generally accepted by experts in the field; (5) the nature and breadth of the

inference adduced; (6) the clarity with which the technique may be explained; (7) the extent to which basic data may be verified by court and jury; (8) the availability of other experts to evaluate the technique; and (9) the probative significance of the evidence.

The district court divided its analysis into two segments. First, it considered the reliability of the RFLP analysis; then, it examined the reliability of the fixed-bin analysis and the statistical interpretation of the results in this case.

With respect to the RFLP analysis, the district court found that the FBI had adhered to strict scientific protocol in their testing of the DNA samples in this case and that it had carefully used controls throughout the experiment in order to assure reliability. The court found that the FBI would throw out the results of a test if any of the controls indicated a problem, and also found that the FBI had done several proficiency tests that satisfied the need for reliability. In addition, the court found that the government's experts were highly regarded in their respective fields and accepted their testimony as to the reliability and general acceptability of the forensic use of RFLP.

Jakobetz's experts challenged the reliability of the RFLP analysis on two main grounds. First, they claimed that because the forensic setting typically involved contaminated samples rather than the pristine samples used in research and diagnostics, there was a possibility that contamination and a resulting degradation of the sample could lead to unreliable results. The FBI experts countered this testimony by showing that an erroneous application of procedures or the degradation of a sample of unknown origin would produce either inconclusive results or a false negative which, in either case, would redound to the defendant's benefit, rather than to his prejudice. On this issue, the district court credited the government experts.

Second, the defense experts criticized the government's matching rule, which allowed confirmation of a visual match if the number of base pairs of the alleles measured on the two autoradiographs were within plus or minus 2.5 percent of each other. They claimed that this 5 percent window was much too large and that it rendered the FBI's mathematical approach scientifically unacceptable. All the government experts testified to the contrary. More particularly, however, the FBI expert testified that the autoradiograph matches in this particular case were within plus or minus 1 percent. The court concluded, therefore, that Jakobetz's general methodological concerns were not relevant in this case. It also properly noted that the size of the window did not "render the matching criteria unreliable as a whole but rather provide[d] fodder for effective cross-examination when that condition occurs." *Jakobetz*, 747 F.Supp. at 257.

The court then considered the reliability of the statistical analysis and interpretation of the results of RFLP analysis. It found that the FBI's use of fixed-bin analysis was reliable and was generally accepted as a method of calculating allele frequencies. The court held that the FBI had not only devised strict standards, but had also followed them in this particular analysis. It also credited the testimony of government experts that the FBI's fixed-bin analysis provides a conservative estimate of allele frequency that more than compensates for potential errors that might result from limitations in technology, limited sample population data, substructure or linkage disequilibrium, and sampling error. The court further found that since the genotype frequency calculations were largely mathematical, involving few subjective judgments, there was little potential for abuse in specific applications. Moreover, Judge Billings found that the FBI had employed "fail-safe" characteristics that caused errors to produce higher genotype frequencies which redounded to the benefit of the defendant.

Defense experts had challenged the statistical interpretation on three grounds. First, they testified that the premise underlying the FBI's statistical analysis was invalid. The FBI had assumed that individuals in the Caucasian race mated randomly

without regard to VNTR frequencies, that is, that there was no evidence of substructure or subgroups within the Caucasian population. Based on this assumption, the FBI used the product rule to arrive at its results.

The product rule is used to calculate the probability that a number of events will occur simultaneously. To arrive at this probability, the probabilities of each event occurring separately are multiplied. But in order for the product rule method to be valid, each event must occur independently of each other. Evidence of substructure would undermine this assumption of independence. For a more thorough explanation of the product rule, *see* Thompson & Ford, *supra*, at 81–82.

Jakobetz's experts attempted to show that there was no factual basis for this assumption, and that therefore, the use of the product rule to estimate genotype frequencies was inappropriate and distorted the government's statistical analysis. Jakobetz introduced testimony to show that individuals could form endogamous groups based on religion, ethnicity, and geography. If genetic substructure existed between these groups then mating would not be truly random. Defendant's experts thus concluded that until more was known about substructure, it was inappropriate to use one data base for all Caucasians and to use the product rule to calculate an allele pattern's frequency. They also stated that it was impossible to know whether the FBI binning process was conservative.

The court, however, chose to credit the testimony of the government's experts who stated that to the extent that substructure might exist for VNTRs within Caucasians, the FBI had sufficiently proven that it had compensated for this possibility by using conservative binning procedures. Two of the government experts had concluded from personal observations of data collected from an array of ethnic groups that to the extent that some substructure exists, the frequency differences between VNTRs of various subgroups were insubstantial.

The district court also properly rejected two other arguments advanced by Jako-betz's experts: (1) the size and composition of the sample population used by the FBI; and (2) the alleged inability of the FBI to replicate their results with the 225 samples used in their pool.

Finally, Judge Billings undertook an overall analysis of the admissibility question under Fed.R.Evid. 403 to determine whether the probative value of the evidence was substantially outweighed by unfair prejudice to the defendant. He ruled that it was not. Moreover, he concluded that the jury would not be overwhelmed, confused, nor misled by this evidence.

Based on the thorough analysis by the district court, we conclude that it did not abuse its discretion by admitting the results of the DNA analysis into evidence. Judge Billings is to be commended for his careful, exhaustive consideration of this issue. We do think, however, that although the district court expressly stated that it was applying the *Williams* standard, the court's findings would satisfy not only the *Frye* standard, but the *Two Bulls* and *Castro* standard as well. For the purpose of guiding other trial judges in the second circuit who may face this question in the future, we do not think that such extensive hearings and findings should be conducted in every case. Judge Billings, himself, recognized that the general theories of genetics which support DNA profiling are unanimously accepted within the scientific community. *See also* Imwinkelried, *supra*, at 20–21; Thompson & Ford, *supra*, at 60; *Two Bulls*, 918 F.2d at 58. In addition, the specific techniques used by the FBI lab in RFLP analysis are commonly used by scientists in microbiology and genetics research. *See* Thompson & Ford, *supra*, at 60–76.

■ Given the findings made by the district court, and after careful consideration and review by this court, it appears that in future cases with a similar evidentiary issue, a court could properly take judicial notice of the general acceptability of the general theory and the use of these specific techniques. *See* McCormick § 203 at 608. Beyond such judicial notice, the threshold for admissibility should require only a pre-

liminary showing of reliability of the particular data to be offered, *i.e.*, some indication of how the laboratory work was done and what analysis and assumptions underlie the probability calculations. The probability data may well vary among different segments of the population. Affidavits should normally suffice to provide a sufficient basis for admissibility. DNA profiling evidence should be excluded only when the government cannot show this threshold level of reliability in its data. The district court should focus on whether accepted protocol was adequately followed in a specific case, but the court, in exercising its discretion, should be mindful that this issue should go more to the weight than to the admissibility of the evidence. Rarely should such a factual determination be excluded from jury consideration. With adequate cautionary instructions from the trial judge, vigorous cross-examination of the government's experts, and challenging testimony from defense experts, the jury should be allowed to make its own factual determination as to whether the evidence is reliable.

We thus conclude that the district court properly exercised its discretion in admitting the DNA profiling evidence proffered by the government in this case; we also conclude that courts facing a similar issue in the future can take judicial notice of the general theories and specific techniques involved in DNA profiling.

## IV. OTHER ISSUES

Having concluded that the district court did not err by permitting DNA profiling evidence, we now turn to the less complicated evidentiary issues raised by Jakobetz as well as his challenge to his sentence.

### A. Admissibility of Throgs Neck Bridge Toll Receipt

■ Jakobetz claims that the district court erroneously allowed the government to admit into evidence a toll receipt for the Throgs Neck Bridge, stamped June 14, 1989, 03:28, $10.00. He objected to the evidence on hearsay grounds, more specifically arguing that the receipt did not fall within the business records exception of Fed.R.Evid. 803(6). The receipt was included as part of a "Trip Cost Report" submitted by Jakobetz to his employer, Wildcat Construction Company, to obtain reimbursement for his expenses. The report recorded trip mileage and expenses and included receipts for the expenses.

The government submitted the toll receipt as part of the business records of Wildcat Construction Company. As foundation for introducing the receipt, the government called Ronald Bartemy, Chief Executive Officer of Wildcat and custodian of the company's records. Bartemy authenticated the records at trial and testified that toll receipts were regularly made part of a trip report, which the company routinely used to reimburse drivers. He further testified that the toll receipt had been submitted by Jakobetz as part of an expense record for a trip made from St. Albans Bay, Vermont, to Westbury, New York, beginning on June 13, 1989.

Rule 803(6) states:

A memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Jakobetz contends that the business record exception requires that the toll receipt be authenticated by a person with first-hand knowledge of the Throgs Neck Bridge record system. He argues that since Wildcat simply had possession of, but did not prepare the record, testimony by Bartemy as custodian of Wildcat's records provided an insufficient foundation to conclude that the toll receipt was authentic. Since Wildcat simply had possession of the record, but had not prepared the record,

Jakobetz asserts that the custodian from Wildcat could not testify as to the authenticity of the toll receipt.

■ We do not read the business record exception so narrowly. Rule 803(6) allows business records to be admitted "if witnesses testify that the records are integrated into a company's records and relied upon in its day to day operations." *Matter of Ollag Constr. Equip. Corp.*, 665 F.2d 43, 46 (2d Cir.1981). Even if the document is originally created by another entity, its creator need not testify when the document has been incorporated into the business records of the testifying entity. *See United States v. Carranco*, 551 F.2d 1197, 1200 (10th Cir.1977).

In this case, Wildcat had incorporated toll receipts into its business records to a sufficient degree to permit an inference as to the receipt's authenticity. Bartemy testified that toll receipts were regularly submitted by drivers as part of their trip reports, and regularly incorporated into the business records for general accounting purposes.

In addition, a toll receipt is not the type of evidence that is so susceptible to fabrication that authentication by a representative of the Throgs Neck Bridge should be required. Jakobetz himself relied on its authenticity when he submitted the receipt for reimbursement of his expenses. He must have believed that the date, time, and amount stamped on the receipt fairly represented a part of his trip for which he sought to be reimbursed. Thus, the trial court did not abuse its discretion by allowing the receipt into evidence.

B. Admissibility of Developed Fishing Photographs

■ Jakobetz next challenges the government's introduction of two photographs taken by the victim's father during a fishing trip. These photographs were developed from a roll of film that had been seized in a search of Jakobetz's residence.

On July 17, 1989, an FBI agent secured a warrant to search Jakobetz's home for a number of items, including a 35 mm Fuji camera belonging to the victim's father.

In addition to the items in the warrant, the agents seized other items, including nine rolls of undeveloped film. Jakobetz moved pretrial to suppress the results of the search, including those items not specified in the warrant.

Before the district court ruled on this defense motion, another FBI agent obtained a warrant from Judge Billings in November 1989 to develop the seized rolls of film. In February 1990, however, Judge Billings partially granted Jakobetz's suppression motion with regard to "those items seized but not particularized in the search warrant." The court referred to some of the suppressed items, but made no mention of the film.

At trial, Jakobetz's counsel objected to the pictures' admission solely on the basis that the introduction of the evidence on rebuttal was outside the scope of the defendant's case. On appeal, Jakobetz contends, for the first time, that the court below improperly admitted the photographs in violation of its own suppression order.

In opposition, the government argues that Jakobetz failed to preserve at trial any objection based on the suppression motion at trial and is therefore barred from raising it on appeal. We agree. In *United States v. Mennuti*, 679 F.2d 1032 (2d Cir.1982), we noted that

> [t]he law in this Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not pressed below * * * and where the party has had ample opportunity to make the point in the trial court in a timely manner, * * * waiver will bar raising the issue on appeal.

*Id.* at 1036 (citation omitted). Although the suppression argument was available at trial, Jakobetz's counsel failed to raise this issue and instead argued only that the photographs were "extremely prejudicial to the defendant's case and went well beyond the scope of the case we introduced."

Since Jakobetz failed to raise the objection at trial, we could reverse only for plain error in the admission of the evidence, *see* Fed.R.Crim.P. 52(b), and when our failure

to reverse "would result in a miscarriage of justice which denied the defendant a fair trial." *U.S. v. Scarpa*, 913 F.2d 993, 1021 (2d Cir.1990) (citation omitted).

In suppressing those items "seized but not particularized in the warrant," the district court found that while the police warrant was lawful and that the discovery of the unparticularized items was inadvertent, *see U.S. v. Bonfiglio*, 713 F.2d 932, 936 (2d Cir.1983), the police had failed to demonstrate probable cause for seizing those items. However, the court's suppression order failed to mention that three months earlier, based on a properly supported application, the court had granted authority to the prosecution to develop the nine rolls of the seized 35mm film not specified in the warrant. Despite Jakobetz's assertions to the contrary, the district court's prior order permitting the government to process the undeveloped film indicates that the suppression order was not intended to cover this film. Concluding, as we do, that the court's admission of the film was not plain error, we reject Jakobetz's claim as to the developed photographs.

C. Admissibility of Photographic Identification

Jakobetz also alleges error in the district court's decision to allow the victim to testify that she had identified Jakobetz from a photographic display about a month after he had kidnapped and assaulted her. He bases his claim on two separate grounds.

■ Jakobetz first contends that the use of his photograph in the array was improper because the photograph was wrongfully acquired, a circumstance that he likens to an illegal seizure. The photograph had been obtained from the files of the New York State police, who had possession of the photograph from an earlier investigation of unrelated charges. The state eventually dismissed those charges. Although under New York law, a court must issue an order directing that all photographs and other items belonging to a former defendant be returned to that defendant upon the termination of an action, N.Y.Crim.Proc.Law § 160.50, no such order was is-

sued after the state prosecution against Jakobetz was concluded. Jakobetz now claims that because the photographs should not have remained in the possession of New York authorities, their continued possession constituted an illegal seizure, requiring application of the exclusionary rule to suppress any evidence that resulted from such seizure. He argues the New York court completely abandoned its judicial role. *See United States v. Leon*, 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1984).

Although Jakobetz asserts a novel argument, we do not think that the "seizure" alleged is one that deserves the special protections provided by the fourth amendment. There is no authority to indicate that Jakobetz's constitutional rights have been violated. At most, Jakobetz may be able to argue that a New York court violated a statutory right under New York law. *Cf.* N.Y.Crim.Proc.Law § 160.50.

In addition, we agree with the government that the federal law enforcement officials who investigated this case did not act with any willful intent. Since the exclusionary rule is designed to deter police misconduct, *see Leon*, 468 U.S. at 916, 104 S.Ct. at 3417, there would be no purpose in applying the rule to this case, where there was no such misconduct. The record suggests that the law enforcement officials involved in this case were not even aware of the requirement that the photograph be returned to Jakobetz. The only error here was the failure of the New York court to issue a timely order to return the photograph—an oversight that does not offend the fourth amendment's protection against unreasonable searches and seizures.

■ Jakobetz then contends that the photo array should have been excluded because it was unduly and impermissibly suggestive. The victim had initially described her kidnapper as a white male with no facial hair or sideburns. The photographic lineup contained pictures of six men, each of whom had a moustache, with Jakobetz's being the least prominent. As a result, Jakobetz argues, the victim was suggestively and impermissibly led to select his

picture, because it depicted a person who was the closest to her description of a man with no facial hair.

■■■■ We see no error here. A district court's determination as to the admissibility of identification evidence should be reversed only upon a showing of clear error. *See United States v. DiTommaso*, 817 F.2d 201, 213 (2d Cir.1987). Identification evidence must be suppressed if the display was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). In other words, the test is "whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit". *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir.1986) (brackets in original).

In this case, the district court specifically held that no due process violation had occurred. It found that the photo array consisted of six photographs depicting male Caucasians of approximately the same height and hair features; that at least three of them, including Jakobetz, had very similar builds; and that all six had moustaches but no beards. The court stated:

> [T]o be sure, defendant's moustache does appear to be smaller than the others. This fact alone, however, does not rise to the level of impermissible suggestiveness. The court does not believe that the victim's description of a man with no facial hair causes defendant's photograph with a thinner moustache to stand out from all the others.

The victim had testified that it was not the thinner moustache which had caused her to identify Jakobetz's photograph, but rather, his facial and bodily features as a whole. Finally, the court was impressed with the high degree of certainty the victim displayed in selecting Jakobetz's photograph. These findings, which are not clearly erroneous, provided the court with sufficient indicia of reliability to overcome any concern that the photographic lineup may have been unnecessarily suggestive. *See United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.1977), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977). *See also DiTommaso*, 817 F.2d at 213.

### D. Admissibility of Results of Searches

Jakobetz next contends that the district court should have suppressed all the evidence resulting from searches of his residence, personal vehicle, and tractor-trailer cab. He argues that the affidavits in support of the search warrants stated that he had been arrested for sexual assault in New York, but did not mention that the charges had been dismissed; that these previously dismissed charges were used as a basis to assume that he was a pattern sexual offender; that as a pattern sexual offender, Jakobetz would tend to retain various items of personal property to remind him of his crimes; and that the affidavits included the information that the victim had identified Jakobetz in an unlawful photographic lineup. He also argues that since there was no evidence to suggest that he would retain any items used in the commission of this crime, the information relied on by the magistrate was stale.

These arguments lack merit. Determinations by magistrates and judges who issue warrants are "accorded great deference and 'any doubts should be resolved in favor of upholding the warrant[s].' " *United States v. Vasquez*, 634 F.2d 41, 45 (2d Cir.1980) (quoting *United States v. Jackstadt*, 617 F.2d 12, 14 (2d Cir.) (per curiam), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980)). Here, Jakobetz does not even raise doubts.

■■■ First, the affidavits supporting the search warrants contained no misleading information about Jakobetz's prior record. They correctly stated that Jakobetz had been arrested for sexual assault in 1986, and the magistrate surely appreciated the difference between arrest and conviction. Moreover, the fact that, in determining probable cause, a judicial officer may take into account a prior similar arrest is not error. *See United States v. Harris*, 403

U.S. 573, 582, 91 S.Ct. 2075, 2081, 29 L.Ed.2d 723 (1971).

■ Second, the affidavits properly reported that the victim had previously identified Jakobetz; but even if the photo array were unduly suggestive, including that evidence in the affidavit supporting the warrant would not necessarily undermine a finding of probable cause where other evidence is sufficient to establish probable cause. *See Vasquez,* 634 F.2d at 44–45; *United States v. Giordano,* 416 U.S. 505, 555, 94 S.Ct. 1820, 1845, 40 L.Ed.2d 341 (1974). Here, there was an overwhelming amount of additional evidence in the affidavit which supported the probable cause determination: the telephone call made to Jakobetz's spouse from a telephone in the same rest area from which the victim was abducted; Jakobetz's prior criminal record which revealed he had been arrested for the same type of sexual offense; interviews with the owner of Wildcat Construction Company, whose records revealed that Jakobetz had been assigned to drive a tractor-trailer to Long Island on the date of the kidnapping; and the results of a consensual search of the Wildcat trailer where strands of the victim's hair were found.

■ Finally, we reject Jakobetz's claim that the search warrants were based on stale information. Probable cause exists for issuance of a search warrant when there is a "fair probability" that the premises will yield the object specified in the search warrant. *United States v. Travisano,* 724 F.2d 341, 346 (2d Cir.1983). The three warrants sought to discover items that Jakobetz could reasonably be expected to retain. An FBI agent asserted that, in his experience as an investigator of sexual assaults, individuals who commit such crimes frequently retain evidence of their crimes. He also reported that about a month before the abduction of the victim in this case, Jakobetz had brandished a pair of handcuffs at his place of work. This fact established that the handcuffs used in the commission of this crime may not have been obtained solely to commit this crime and were probably being retained by Jakobetz. Together, these considerations provide sufficient basis for determining that the information supplied in the affidavit was not stale. We therefore find no error in the issuance of the search warrants.

## E. Sentencing

Jakobetz's final challenge is to certain aspects of his sentence. At sentencing, the district court determined that the base offense level under the sentencing guidelines was 35 and that the criminal history category was IV; the court considered, *inter alia,* a prior driving-while-ability-impaired ("DWAI") conviction to place Jakobetz in category IV. The court then upwardly departed, over Jakobetz's objection, to criminal history category VI, basing its departure on testimony that Jakobetz had committed a prior sexual assault in New York, and that, at the time of the offense, he had a pending misdemeanor drug charge and a pending driving-while-intoxicated ("DWI") charge. Jakobetz challenges the district court's calculation of his criminal history on two grounds: first, that the sentencing judge improperly considered a prior guilty plea for the DWAI offense in the calculation of the initial criminal history category, and, second, that the district court did not make specific findings to support its decision to make an upward departure that placed Jakobetz in criminal history category VI.

### 1. *The DWAI Convictions*

■ Jakobetz asserts that the Supreme Court's ruling in *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), prohibited consideration of the 1989 DWAI conviction, because it was constitutionally invalid. *Tucker* prevents a sentencing court from relying on an unconstitutional conviction in arriving at its sentencing decision. *Id.* at 449, 92 S.Ct. at 593. Jakobetz argues that his attorney's entry of a guilty plea for the DWAI charge constituted a violation of *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Jakobetz raises this claim, as he did in the court below, without any prior judicial declaration that the DWAI conviction was invalid.

*Tucker,* however, left open the question of whether a defendant may collaterally attack the constitutionality of a prior conviction at a sentencing hearing without first obtaining a declaration of the conviction's invalidity from another court, and the commentary to the sentencing guidelines, recently amended, leaves the resolution of this question to the discretion of the federal courts.

The prior commentary to the relevant guidelines stated that "convictions which the defendant shows to have been constitutionally invalid may not be counted in the criminal history score," United States Sentencing Commission, *Guidelines Manual,* § 4A1.2, comment. (n. 6) (Nov. 1989), and some other courts read this previous version to permit the sentencing court to entertain challenges to the validity of prior convictions without exhausting remedies in other fora. *See U.S. v. Bradley,* 922 F.2d 1290, 1297–98 (6th Cir.1991) (sustaining challenge to use of prior state conviction at federal sentencing hearing); *U.S. v. Brown,* 899 F.2d 677, 679–80 (7th Cir.1990) (affirming district court's determination that prior state convictions were valid); *U.S. v. Landry,* 709 F.Supp. 908, 913 (D.Minn.1989) (permitting offender to launch ultimately successful attack on validity of a prior conviction). At least one court held that the guidelines actually require the district court to hear such a challenge. *See U.S. v. Jones,* 907 F.2d 456, 469–70 (4th Cir.1990) (remanding case for resentencing because district court failed to entertain challenge to prior conviction), *cert. denied,* —— U.S. ——, 111 S.Ct. 683, 112 L.Ed.2d 675 (1991).

The amendment to this commentary under which Jakobetz received his sentence notes that the discretion to determine whether the sentencing judge may entertain such challenges remains with the courts. It states that "sentences resulting from convictions that a defendant *shows to have been previously ruled constitutionally invalid* may not be counted in the criminal history score." U.S.S.G., § 4A1.2, comment (n. 6) (Nov. 1990) (emphasis added). If an offender cannot supply such a ruling demonstrating the invalidity of a prior conviction, the new commentary "leaves for court determination the issue of whether a defendant may collaterally attack at sentencing a prior conviction." *Id.* at § 4A1.2 comment. (backg'd.).

In short, the newly revised version of the guidelines clarifies the commission's position on defendants' direct challenges to the validity of prior convictions at sentencing: while defendants may always present the sentencing court with evidence that another court has ruled their prior convictions invalid and hence unsuitable for consideration as part of the criminal history score at sentencing, the court also retains discretion to determine whether a defendant may mount an initial challenge to the validity of such convictions.

Further consideration of this issue is unnecessary, however, as Jakobetz's claim concerning the alleged invalidity of his prior conviction is meritless. Jakobetz asserts that he "never entered a plea of guilty to the charge nor waived any of his constitutional protections prior to the New York Court's finding of guilt." In addition to his failure to produce any prior ruling on the validity of his DWAI conviction, Jakobetz submitted to the court below nothing more than conclusory allegations that his prior DWAI conviction was constitutionally invalid. In these circumstances, Judge Billings correctly exercised his discretion when he rejected Jakobetz's challenge to the validity of the prior DWAI conviction.

■ Alternatively, Jakobetz argues that even if the conviction is considered a valid prior conviction, the DWAI conviction constituted a "minor traffic infraction" inappropriate for consideration under the guidelines. He notes that the DWAI charge to which he pled guilty had been reduced from a DWI charge, and that he received a fifteen-day sentence for the conviction. The reduced charge and the sentence's length, appellant argues, exclude the state DWAI conviction from consideration in the calculation of criminal history.

His argument fails, however, given § 4A1.2(c) of the guidelines, which enumerates those misdemeanor convictions which

the sentencing judge may consider. Although that section *does* exclude misdemeanor sentences shorter than thirty days, the commentary to this section explicitly states that

> convictions for driving while intoxicated or under the influence (and similar offenses by whatever name they are known) *are* counted. Such offenses are not minor traffic infractions within the meaning of § 4A1.2(c).

U.S.S.G. § 4A1.2, comment. (n. 5) (emphasis added).

The commission's decision to count prior DWI convictions and related offenses like Jakobetz's DWAI charge reflects the commission's determination that DWI offenses are of sufficient gravity to merit inclusion in the defendant's criminal history, however they might be classified under state law. *See U.S. v. Lewis*, 896 F.2d 246, 250 (7th Cir.1990).

Jakobetz's prior DWAI conviction merits similar treatment. In New York, the DWAI offense is a lesser included offense of DWI. N.Y. Vehicle and Traffic Law §§ 1192, 1196 (McKinney 1986). Section 4A1.2(c)'s restrictions on the consideration of misdemeanor convictions, then, do not constrain the sentencing judge's discretion to consider the DWAI sentence, and the court below acted properly in considering this prior conviction when calculating appellant's criminal history.

### 2. *Criminal History Upward Departure*

▇▇ Jakobetz also challenges the upward departure in his criminal history from category IV to VI. He argues that the district court failed to follow the procedures governing criminal history departures articulated by this circuit and, consequently, the court did not state its reasons for the departure with the necessary specificity. Jakobetz essentially argues that the court below erred by not assigning specific point values to each prior incident used to support the criminal history departure. For the following reasons, we disagree.

▇▇ While it is true that the guidelines require a sentencing court to assign specific point values to prior convictions when that court is determining a defendant's initial criminal history category, *see* U.S.S.G. § 4A1.1, such specificity is not required in making a criminal history departure. Instead, the two-part procedure we have adopted to guide the district courts in making upward departures based on prior conduct requires the sentencing judge to first determine the criminal history category that best represents the offender's prior conduct and use the sentencing range for that category in making the departure. The inquiry, however, does not end there. The district court must then proceed sequentially through the categories, beginning with the defendant's original criminal history category and then proceeding in order through the higher categories, "considering whether the next higher category adequately reflected the seriousness of the defendant's record and, only upon finding it inadequate, moving on to a still higher category." *See U.S. v. Coe*, 891 F.2d 405, 412–13 (2d Cir.1989). This procedure serves to guide the district court's discretion in making an upward departure.

It does not, however, require the sentencing judge to assign specific point values to the conduct evaluated for the purposes of criminal history departures. Comparisons to the point system set forth in § 4A1.1 may assist this court in evaluating the reasonableness of a district court's departure, *see, e.g., U.S. v. Cervantes*, 878 F.2d 50, 55 (2nd Cir.1989) (prior bail-jumping conduct "would probably account for no more than two or three Criminal History points" if it had been sentenced under § 4A1.1), but for some conduct to be considered under § 4A1.3, there are no such counterparts available. *Id.* at 55 (no § 4A1.1 provision precisely applicable to § 4A1.3 provision allowing for departure if defendant was pending trial at time of instant offense). A strict requirement that the district courts affix point values to their findings, then, is of little use when the guidelines themselves fail to do so. The two-step procedure set forth in *Cervantes* and *Coe*, when properly followed, should provide this court with sufficient information to assess the reasonableness of the district court's departure.

We think that in this case Judge Billings articulated with sufficient clarity the factual findings that underlay his decision to make an upward departure of two criminal history categories. He properly considered a prior sexual assault not resulting in a conviction as similar adult criminal conduct. *See* § 4A1.3(e). If Jakobetz had received a sentence for this conduct, he likely would have received three criminal history points. *See* U.S.S.G. § 4A1.1.(a). Moreover, the court's consideration of the pending narcotics and DWI charges that Jakobetz faced while committing the crime in this case merits at least a one-point departure, given § 4A1.3(d)'s provision that such pending charges may be considered in making upward departures.

Jakobetz, however, argues that the 1989 DWAI offense cannot be used as one of those pending charges in making an upward departure in his criminal history category because the district court counted that sentence when it calculated his original criminal history score. Even if Jakobetz were correct that the DWAI offense was doublecounted, however, the narcotics offense would still remain as an adequate basis for the departure based on the pending charge. Given these considerations, the lower court's decision to increase Jakobetz' criminal history by two criminal history categories constituted a reasonable upward departure.

## V. CONCLUSION

The district court's judgment of conviction is affirmed.