OPINION *Page 2 
{¶ 1} Defendant-appellant Christina Baldwin ("Baldwin") appeals the February 1, 2008 Judgment Entry of the Common Pleas Court, Putnam County, Ohio convicting her on three counts of theft from a disabled person, in violation of R.C. 2913.02(A)(1), (3) and (B)(3), felonies of the fifth degree. Baldwin was placed on three years of community control, ordered to serve fifteen days in jail, and ordered to pay restitution.
 {¶ 2} On July 23, 2007 a Putnam County Grand Jury indicted Baldwin on seven counts of theft from a disabled person, violations of R.C. 2913.02(A)(1), (3), and (B)(3), felonies of the fifth degree. On November 19, 2007, the parties stipulated that all of the victims were disabled adults. Prior to the start of the jury trial, the state dismissed counts two, four, six, and seven of the indictment. Trial commenced on November 26, 2007, and the jury found Baldwin guilty on counts one, three, and five. The trial court later sentenced Baldwin to three years of community control sanctions, fifteen days in jail, and to pay restitution in the amount of $212.68.
 {¶ 3} Baldwin now appeals, asserting three assignments of error.
 FIRST ASSIGNMENT OF ERROR THE COURT ERRED BY ADMITTING UNRELIABLE RECEIPTS UNDER AN INCORPORATED BUSINESS RECORDS EXCEPTION IN CONTRAVENTION OF THE CONFRONTATION CLAUSE AND THE PROHIBITION AGAINST HEARSAY WITHIN HEARSAY. *Page 3 
 SECOND ASSIGNMENT OF ERROR THE COURT ERRED BY ADMITTING UNSUBSTANTIATED EVIDENCE OF OTHER BAD ACTS IN CONTRAVENTION OF EVID.R. 404(B) AND EVID.R. 1002.
 THIRD ASSIGNMENT OF ERROR THE JURY VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 4} For ease of discussion, we elect to address Baldwin's assignments of error out of order. In her third assignment of error, Baldwin argues that her convictions were not supported by the manifest weight of the evidence.
 {¶ 5} An appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. State v. Thompkins (1997), 78 Ohio St.3d 380, 387,678 N.E.2d 541, 1997-Ohio-52. In reviewing whether the trial court judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony.Id. In doing so, this court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Andrews, 3rd Dist. No. 1-05-70,2006-Ohio-3764 citing State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717; Thompkins, 78 Ohio St.3d at 387. *Page 4 
 {¶ 6} In making this determination, the Ohio Supreme Court has outlined eight factors for consideration, which include "whether the evidence was uncontradicted, whether a witness was impeached, what was not proved, that the reviewing court is not required to accept the incredible as true, the certainty of the evidence, the reliability of the evidence, whether a witness's testimony is self-serving, and whether the evidence is vague, uncertain, conflicting, or fragmentary."State v. Apanovitch (1987), 33 Ohio St.3d 19, 23-24, 514 N.E.2d 394, citing State v. Mattison (1985), 23 Ohio App.3d 10, 490 N.E.2d 926, syllabus. Ultimately, however, "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin,20 Ohio App.3d at 175.
 {¶ 7} Baldwin was the home manager of a facility called ResCare from 2004 through December 2006. Prior to working as the home manager, Baldwin worked in direct care, which required her to participate in all aspects of caring for the facility's consumers. The consumers were adult men with various mental disabilities, and direct care workers assisted them with their bathing, clothing, grooming, cleaning, shopping, and all other tasks. Direct care workers were also responsible for taking the men on outings in the community. To go on an outing, the direct care worker would "sign out" a certain amount of money from the consumer's "home account," and perform the activity with the consumer. After *Page 5 
the outing, the direct care worker would return the change to the man's "home account." The direct care worker would document these financial transactions on petty cash slips and attach the store receipts thereto.
 {¶ 8} When Baldwin was promoted to home manager, one of her responsibilities was to manage the men's financial situations. For example, Baldwin would make sure the men had sufficient, but not too much, money in their savings accounts at a local bank. She also ensured that they had some spending money available in their "home accounts." Baldwin and the direct care worker who went on the outing were required to sign the petty cash slip. At some point, Baldwin had trouble getting direct care workers to sign the petty cash slips, so she had them sign multiple slips at the end of a month.
 {¶ 9} During the summer of 2006, Baldwin and her family experienced financial difficulties, including foreclosure on their residence. Baldwin admitted that she was unable to purchase new school clothes for her children, including a teenage son and two children under the age of ten. On August 8, 2006, Baldwin went to a J.C. Penney's store located in Fort Wayne, Indiana, where she purchased $128.54 of "young men's" clothing with her J.C. Penney's credit card and a discount coupon. Baldwin submitted the receipt to a consumer's "home account" and "reimbursed" herself for the purchase without delivering the clothing to the consumer. *Page 6 
 {¶ 10} Baldwin claimed that these clothes purchased at J.C. Penny's were for one of the consumers who lived in the home. However, no one was able to testify as to where these clothes went after they were purchased. No witness testified that they ever saw the consumer with these items, or that they ever saw these items in the consumer's room. Several direct care workers testified that they were familiar with this consumer's room and his possessions, but they were unable to locate the clothes which were purchased at J.C. Penny's. Moreover, testimony was given at trial that direct care workers made a big deal out of any new item a consumer received; therefore, a consumer receiving $128.54 of new items would have been noticed in the home.
 {¶ 11} On October 13, 2006, Baldwin purchased $44.89 of "women's" and "children's" clothing and personal items from the Goodwill store in Ottawa, Ohio. Baldwin submitted the receipt to a different consumer's "home account" and again "reimbursed" herself without delivering any items to the consumer. On October 15, 2006, Baldwin spent $39.25 on clothing from the "women's" and "children's" departments at the Goodwill store located in Defiance, Ohio. Baldwin submitted that receipt to a third consumer's "home account" and "reimbursed" herself without providing any items to the consumer.
 {¶ 12} Testimony was given with respect to both of the Goodwill purchases that no direct care worker ever saw the items in the possession of the consumer *Page 7 
who paid for them. Moreover, no worker remembered either of these consumers getting new clothes during the time of the purchase.
 {¶ 13} Finally, testimony was given that these purchases were contrary to ResCare's policies. First, if a purchase over $100.00 was going to be made, a meeting would occur involving various ResCare employees as well as a consumer's guardian to approve the purchase. This was not done prior to the purchase from J.C. Penny's. Second, consumers were to accompany staff on shopping trips. A consumer's money was not supposed to be spent without the consumer present. However, no consumer was present during these trips. Third, neither of the direct care workers who Baldwin asked to sign off on these transactions remembers being a part of these trips. Testimony was given that they were only asked to sign off on these petty cash slips because it was the end of a month.
 {¶ 14} In the present case, given the totality of the foregoing testimony, we cannot find that the jury clearly lost its way in convicting Baldwin. Accordingly, Baldwin's third assignment of error is overruled.
 {¶ 15} In her first assignment of error, Baldwin argues that the trial court erred by admitting retail receipts as business records. Decisions regarding the admissibility of evidence are within the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion. State v. Yohey (March *Page 8 
18, 1996), 3d Dist. No. 9-95-46, citing State v. Graham (1979),58 Ohio St.2d 350, 390 N.E.2d 805 and State v. Lundy (1987), 41 Ohio App.3d 163,535 N.E. 2d 664.
An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 16} In the present case, the receipts in question were attached to ResCare's business records and were admitted under the business records exception to the hearsay rule. Evidence R. 803(6) governs the business records exception to the hearsay rule and provides as follows:
 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 * * * A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. *Page 9 
 {¶ 17} Baldwin argues that the receipts were improperly admitted as business records because they were not created by ResCare, but instead were prepared by another entity and incorporated into ResCare's business records.
 {¶ 18} Other Ohio courts have considered the issue of incorporated records and have found federal law to be instructive on this issue. SeeGreat Seneca Financial v. Felty, 170 Ohio App.3d 737, 869 N.E.2d 30,2006-Ohio-6618. "A number of circuit courts have held that exhibits can be admitted as business records of an entity, even when that entity was not the maker of those records, provided that the other requirements of Fed.R.Evid. 803(6) are met and the circumstances indicate that the records are trustworthy." Great Seneca, 170 Ohio App.3d at 743. See also, United States v. Childs (C.A.9, 1993), 5 F.3d 1328, 1333;United States v. Travers (C.A.9, 2004), 92 Fed.Appx. 489, 494 ("Records need not actually be prepared by the business to constitute business records, so long as they are received, maintained, and relied upon in the ordinary course of business"); United States v. Jakobetz (C.A.2, 1992), 955 F.2d 786, 801 ("Even if the document is originally created by another entity, its creator need not testify when the document has been incorporated into the business records of the testifying entity");Saks Internatl. Inc. v. M/V Export Champion (C.A.2, 1987),817 F.2d 1011, 1013-14 (documents may properly be admitted as business records even though they are the records of an entity other than one of the parties, and *Page 10 
even though the foundation for their receipt is laid by a witness who is not an employee of the entity that owned and prepared them, provided that there are sufficient indicia of the records' reliability and trustworthiness).
 {¶ 19} Baldwin testified herself, that receipts from other businesses were often relied upon, accepted as accurate, retained by ResCare, and used in ResCare's course of business. Therefore, we believe that the receipts became part of ResCare's business records, which Baldwin stipulated to. Moreover, we note that this is not a case of incorporated records where ResCare's employees have no independent knowledge of the material contained in the receipts. ResCare's employee, Baldwin, made the purchase and would likely be expected to check the receipts for some level of accuracy at the time of purchase.
 {¶ 20} Additionally, witnesses testified, with respect to both the Goodwill and J.C. Penny's receipts, that those receipts were business records of those entities. Employees of both Goodwill and J.C. Penny's were called to testify that those receipts were of the type normally made in the course of those businesses. Moreover, the Goodwill employee testified as to the coding procedure of those receipts, stating that some error could have been made in the description of the items sold.
 {¶ 21} Baldwin conceded that she made the purchases documented on those receipts and sought signatures of other ResCare employees to verify the purchases. *Page 11 
However, Baldwin also argues that the admission of these records violated her right to confrontation arguing that the records do not bear an "indicia of reliability." Baldwin was the person who incorporated the receipts into ResCare's records; Baldwin admitted that she made the purchase in question; and Baldwin relied on these receipts in the course of her employment with ResCare.
 {¶ 22} Finally, we note that not only was testimony given regarding the purchases, but the purchases themselves were logged in ResCare's records under each consumer's account. Therefore, the admission of the receipts themselves would not be necessary to show that purchases were made for consumers, but the staff did not see the consumer receive any such purchases. As such, even if the admission of the receipts was in error, it was harmless error. Accordingly, Baldwin's first assignment of error is overruled.
 {¶ 23} In her second assignment of error, Baldwin contends the trial court erred when it allowed Virginia Longbrake, a direct care worker at ResCare, to testify during the state's case in chief about "other bad acts" that occurred in July 2006. Decisions regarding the admissibility of evidence are within the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion. State v.Yohey (March 18, 1996), 3d Dist. No. 9-95-46, citing State v.Graham (1979), 58 Ohio St.2d 350, 390 N.E.2d 805 and State v. Lundy
(1987), 41 Ohio App.3d 163. An abuse of discretion "connotes more than an error of law or *Page 12 
judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 24} Baldwin argues that the evidence of a prior bad act is improper under Evid. R. 404(B). Evid R. 404(B) provides as follows:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 Moreover, R.C. 2945.59 provides as follows:
 In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.
 {¶ 25} "Other acts" evidence may be admitted during the state's case in chief to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid. R. 404(B);State v. Chaney, 3rd Dist. No. 13-05-12, 2006-Ohio-6489
at ¶ 23, citing State v. Smith (1990), 49 Ohio St.3d 137, 139,551 N.E.2d 190. Generally, in a criminal trial, evidence of previous or subsequent criminal acts, wholly independent of the offense for which a defendant *Page 13 
is on trial, are inadmissible. State v. Smith (1990), 49 Ohio St.3d 137,139; State v. Wilkinson (1980), 64 Ohio St.2d 308, 314. Exceptions to this general rule are limited by Evid. R. 404(B) to instances where the probative value of the evidence is sufficient to allow its admission.Smith, 49 Ohio St.3d at 139. Moreover, other acts evidence need only be proven by "substantial proof, not proof beyond a reasonable doubt."State v. Jamison (1990), 49 Ohio St.3d 182, 187, 552 N.E.2d 180.
 {¶ 26} At trial, Longbrake testified she believed the consumers at ResCare were not getting clothes or other merchandise even though employees were submitting receipts for those items, and she suspected Baldwin was involved in the thefts. Trial Tr., Mar.28, 2008, 270:12-27. Drawing an objection from defense counsel, Longbrake began to state, "I worked first shift, and we[1] would take a consumer that was two on one[2] in the community, we took him through McDonald's; and later on she — ." Id. at 270:20-23. The court held a sidebar outside the hearing of the jury, and defense counsel indicated that his objection was "relevancy of this testimony. While we have a prior statement, it is my understanding this is going to deal with a [consumer/victim], who was never part of this case on any indictment." Id. at 271:8-12. After providing the victim's identity and the date of the alleged incident at McDonald's to the court, the *Page 14 
assistant prosecutor stated that the evidence was appropriate under Evid. R. 404(B) as a common plan or scheme. Id. at 271:20-25. The court asked the prosecutor, "[a]nd it is your representation that this testimony will involve a similar situation to the three counts that would be submitted to the jury of consumers that the defendant was dealing with; is that your recitation?" Id. at 272:7-11. The prosecutor said, "[t]hat's exactly it, Judge." Id. at 272:12-13. The court overruled the objection, and Longbrake testified as follows:
 Q: Did anything occur that began to make you suspicious that the defendant was committing thefts?
 A: The first time was when we, I worked days and we took a consumer that was two on one in the community to McDonald's. And then, well, I was, she had me sign the receipt like, I don't, like maybe weeks later; and I noticed the date was when I went, and he didn't eat, she did. And the next time, the same situation, only she ate half and then gave it to him. Well, the first time I thought, well, maybe she forgot, you know.
 Q: Do you recall when, approximately, that occurred?
 A: I believe in October. No, it was in July. It was warm.
 * *
 Q: What year? July of what year?
 A: `06.
 * *
 Q: And did you then go through a drive-thru?
 A: Yes.
 Q: What drive-thru? *Page 15 
 A: McDonald's.
 Q: And who ordered food?
 A: [Baldwin] did.
 Q: And who ate the food?
 A: She did, and then the other time she ate half and then gave the other half to [the consumer].
 Q: On the first time when she ordered food and ate it, did you subsequently see a McDonald's receipt in that consumer's pile?
 A: Yes.
 Q: And was there also a petty cash disbursement slip which matched the receipt?
 A: Yes.
 * *
 Q: Well, did that cause you to believe that the money was taken out of the consumer's account to pay for that meal?
 A: Yes, yes, yes.
 Q: And you indicated that those two out-to-eat occasions began your suspicions.
 A: Yes.
Id. at 274-276.
 {¶ 27} First, Longbrake's testimony was admissible to establish the basis for the initial suspicion of Baldwin's dishonest conduct which in turn, led to the investigation into the other misappropriation of patient clothing funds for which *Page 16 
appellant was ultimately indicted. Hence, the explicit testimony that "those two out-to-eat occasions began your suspicions" was admissible for reasons entirely independent of any of the standards pertaining to "other acts" testimony. Instead, the testimony was admissible to show the progression of events leading up to Longbrake reporting her suspicions that Baldwin was misappropriating the consumers' funds.
 {¶ 28} However, as it happened, the conduct regarding the food purchases was similar enough to the conduct regarding the misuse of clothing funds that it tended to show a lack of mistake, accident or coincidence, i.e. knowing behavior in the misappropriation of the clothing money, in any event. This was something the State was obligated and entitled to prove beyond a reasonable doubt under the indictment and is not a basis for excluding the evidence.
 {¶ 29} In sum, the food purchase testimony was not introduced solely to establish that because the Baldwin may have engaged in such conduct in the past, that Baldwin must have engaged in the conduct under indictment. Accordingly, Baldwin's third assignment of error is overruled.
 {¶ 30} Based on the foregoing, the February 1, 2008 Judgment Entry of the Common Pleas Court, Putnam County, Ohio is affirmed.
Judgment Affirmed
 ROGERS, J., concurs.
[1] Longbrake and Baldwin were the referenced "we."
[2] "Two on one" meant that two employees of ResCare were required to accompany one consumer on outings. Trial Tr., at 275. *Page 17